RECEIVED
IN LAKE CHARLES, LA

JAN - 5 2011
7AM
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **LAROI JACKSON** | : | **DOCKET NO. 2:09 CV974** |
| **VS.** | : | **JUDGE MINALDI** |
| **GEARBULK, INC., et al.** | : | **MAGISTRATE JUDGE KAY** |

## MEMORANDUM RULING

Before the Court is a Motion for Summary Judgment, filed by the defendant, Gearbulk,

Inc. ("Gearbulk") [Doc. 15]. The plaintiff, Laroi Jackson, filed an Opposition [Doc. 29].

Gearbulk filed a Reply [Doc. 39].

## FACTS

On May 14, 2008, the M/V Dunlin Arrow, a general cargo ship operated by Gearbulk, the

vessel owner's agent, arrived in the port of Lake Charles, Louisiana from Port Manatee, Florida.

Upon arrival, Gearbulk turned the vessel over to James J. Flanagan Stevedores ("JJFS") for

cargo discharge operations. No members of the vessel's crew were present during unloading

operations. Jeffrey Kingston and Hollin Chretien acted as superintendents for JJFS, and they

oversaw discharge operations aboard the M/V Dunlin Arrow on May 14. That evening, JJFS

Longshoremen entered Hold 2 to discharge its cargo, which consisted of bundles of "sling" and

bundles of hardboard.[1]  The bundles of hardboard were stacked two tiers high at the bottom of

---

[1] Def.'s Statement of Uncontested Material Facts ¶¶ 1-7 [Doc. 15-2]; Pl.'s Statement of
Uncontested Material Facts ¶ 1-2 [Doc. 29-1]. There are typically two methods of discharging
sling. Either JJFS longshoremen would enter the ship's hold and pull pre-packaged slings of
broken and displaced cargo or dunnage out of the hold or they would send slings into the hold
and have the longshoremen place these slings underneath the broken piles of cargo. Once in
place, the gantry crane would "sling them out of the hol[d]." Moreover, when discharging the
bundles of hardboard from Hold 2, JJVS longshoremen would enter the ship's Hold and hook the

1

Hold 2.[2]  Although discharge operations began on May 14, they did not fully discharge the bundles of hardwood that evening.[3]

The following day, JJFS foreman, Eddie White, hired the plaintiff to work as a longshoreman in the ship's cargo operations.  That morning, the plaintiff assisted in the discharge of Aluminum ingots from Hold 1.[4]  Meanwhile, from 3:15 to approximately 5:00 p.m., a separate gang of JJFS longshoremen unloaded bundles of hardboard stored in Hold 2.[5] Sometime after lunch, Raymond Dallas, a JJFS walking foreman, instructed the plaintiff, along with three co-workers, to clean the dunnage[6] littering the floor of Hold 2, and the plaintiff completed that task between 4:00 and 6:00 p.m. that evening.[7]

---

bundles together band-by-band.  The longshoremen hook the bundles to the gantry crane, which then removes the bundles of cargo from the hold and places it on the dock.  *See, e.g.,* Pl.'s Mem. in Supp. of Summ. J., Ex. 3, Dep. of Jeff Kingston 14: 13-20 [Doc. 15].  To assist in the discharge of both cargo and sling, JJFS longshoremen start at the top of the cargo and work their way down, traveling tier-by-tier over the hold.  According to the deposition testimony, longshoremen use a short, portable ladder, or the bundles of cargo, to travel from one tier to the next.  *See* Pl's Mem in Supp. of Summ. J., Ex. 4, Dep. of Hollin Chretien 12-14 [Doc. 15].

[2] Def.'s Reply, Ex. 11, Aff. of Richard Betancourt ¶¶ 3-5 [Doc. 39-1].

[3] Def.'s Statement of Uncontested Material Facts ¶¶ 8-10 [Doc. 15-2]; Pl.'s Statement of Uncontested Material Facts ¶ 3 [Doc. 29-1].

[4] Def.'s Statement of Uncontested Material Facts ¶¶ 11-12 [Doc. 15-2]; Pl.'s Statement of Uncontested Material Facts ¶ 3 [Doc. 29-1].

[5] Def.'s Statement of Uncontested Material Facts ¶¶ 9-10 [Doc. 15-2]; Pl.'s Statement of Uncontested Material Facts ¶ 3 [Doc. 29-1].

[6] "Dunnage is boards [that stevedores] use for spacing in the hold to fill in gaps between the cargo, either plywood to brace stuff, or they've got 3-by-3s to make braces and blocks to fill in any kind of gaps in the stow."  Pl.'s Mem. in Supp. of Summ. J. Ex. 3, Dep. of Jeff Kingston 15:10-14 [Doc. 15].

[7] Def.'s Statement of Uncontested Material Facts ¶¶ 13-15 [Doc. 15-2]; Pl.'s Statement of Uncontested Material Facts ¶ 3 [Doc. 29-1].

2

To enter Hold 2, the plaintiff used the vessel's fixed vertical access ladder at the forward end of the hold.  The ladder reached only the top level of the tiered hardwood bundles, which resembled large four-foot stairs descending to the hold's steel floor.  The final step required the plaintiff to climb down two vertically stacked bundles, an eight-foot descent.  To reach the floor from this height, the plaintiff used a portable, aluminum ladder, which was already positioned at an angle between the bundle and the floor.  Although he did not check the ladder before climbing down to ensure that it was safe, he had no problems when he descended to the floor of Hold 2.[8]

The plaintiff and his fellow longshoremen then cleaned the floor of Hold 2.  Once they finished, the plaintiff exited the hold the same way he entered, using the portable, aluminum ladder.  While on the top rung of the ladder, just as he was swinging his left foot onto the top of the lowest level of cargo bundles, the ladder slid out from underneath him.  He fell approximately eight feet to the floor, injuring his back, shin, and knee.[9]

Immediately after the accident, the plaintiff noticed the ladder was missing a footing on one side of its base.  He claims that he did not see this allegedly dangerous condition before beginning his climb out because debris at the base of the ladder obstructed his view.  Although unsure of how he exited the hold, the plaintiff, along with his co-workers, eventually climbed out.  He immediately reported the accident to Mr. Dallas.[10]  Despite reporting the incident, Mr.

[8] Def.'s Statement of Uncontested Material Facts ¶¶ 15-24 [Doc. 15-2]; Pl.'s Statement of Uncontested Material Facts ¶ 3 [Doc. 29-1].

[9] Def.'s Statement of Uncontested Material Facts ¶¶ 25-28 [Doc. 15-2]; Pl.'s Statement of Uncontested Material Facts ¶ 3 [Doc. 29-1].

[10] Def.'s Statement of Uncontested Material Facts ¶¶ 28-31 [Doc. 15-2]; Pl.'s Statement of Uncontested Material Facts ¶¶ 3-4 [Doc. 29-1].

Dallas did not immediately complete an accident report. Instead, the plaintiff completed the report roughly one month after the incident.[11]

Approximately one year later, the plaintiff filed this lawsuit against Gearbulk and the M/V Dunlin Arrow, which is the first time Gearbulk had any knowledge of the incident.[12]  The plaintiff alleges a cause of action under § 5(b) of the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 905(b), for the injuries he sustained from falling off the ladder.

In its Motion for Summary Judgment, Gearbulk claims that there is insufficient evidence that the vessel owned the ladder involved in the alleged accident. Alternatively, Gearbulk insists that, even if the vessel owned the ladder, the ladder did not pose an unreasonable risk of harm to an expert and experienced longshoreman. In addition, Gearbulk claims there is insufficient evidence to indicate (1) the vessel had actual knowledge that the portable ladder posed an unreasonable risk of harm to the longshoreman or (2) Gearbulk could not rely on JJFS to ensure the safety of the plaintiff.[13]  In relevant part, the plaintiff responds by asserting that the finder of fact may infer that the ladder belonged to Gearbulk from the deposition testimony and circumstances surrounding the accident. Ultimately, the plaintiff argues that there is at least an issue of material fact as to liability.[14]

---

[11] Def.'s Statement of Uncontested Material Facts ¶¶ 32-33 [Doc. 15-2]; Pl.'s Statement of Uncontested Material Facts ¶¶ 4-5 [Doc. 29-1].

[12] Def.'s Statement of Uncontested Material Facts ¶ 34 [Doc. 15-2]; Pl.'s Statement of Uncontested Material Facts ¶ 5 [Doc. 29-1]; Def.'s Mem. in Supp. of Summ. J., Aff. of Richard Betancourt ¶ 8 [Doc. 15].

[13] Def.'s Mem. in Supp. of Summ. J. [Doc. 15-1].

[14] Pl.'s Opp'n [Doc. 29].

Little, however, is known of the alleged accident.  For instance, neither John Guion nor Danny Doucet, two purported witness to the incident, have any recollection of the accident or the plaintiff.  In addition, neither individual knows who owned the disputed ladder.[15]  Indeed, no deponent has any direct knowledge that the vessel owned the defective ladder.  Of all the evidence presented, only the plaintiff claims that the ladder belonged to the vessel.  His justification is not based on any assertion that the ladder displayed the name "Gearbulk" in orange lettering, as is apparently customary for Gearbulk equipment.  Rather, his reasoning is based on an inference: that is, the ladder being in Hold 2 when he went down to clean dunnage.[16]  Similarly, Mr. Kingston testified that the disputed ladder belonged to JJFS.  But, like the basis for the plaintiff's testimony, Mr. Kingston's testimony is based on an inference: JJFS' purported practice of providing its longshoremen with ladders.[17]

On the one hand, additional testimony supported Mr. Kingston's reasoning.  JJFS supervisory employees indicated that it is the practice of JJFS to bring and use its own ladders when loading and unloading vessels.[18]  In fact, such a practice is required by federal regulation.  *See* 29 C.F.R. § 1918.24 (Safety and Health Regulations for Longshoring).  Mr. Guion testified that when ladders are provided by JJFS, the ladders are generally defective.  In fact, Mr. Doucet claims to have seen JJFS ladders with defects like the ladder that caused the plaintiff's injuries:

---

[15] Def.'s Mem. in Supp. of Summ. J., Ex. 8, Dep. of John H. Guion 7:2-12 & Ex. 9, Dep. of Danny Doucet, 8: 16-24 [Doc. 15].

[16] Def.'s Mem. in Supp. of Summ. J., Ex. 5, Dep. of Laroi Jackson 99: 23-24 & Ex. 9, Dep. of Danny Doucet, 18: 18-21 [Doc. 15].

[17] Def.'s Mem. in Supp. of Summ. J., Ex. 3, Dep. of Jeff Kingston 16:10-11 [Doc. 15].

[18] Def.'s Mem. in Supp. of Summ. J., Ex. 3 Dep. of Jeff Kingston 16:10-11 & Ex. 4 Dep. of Hollin Chretien 20:13-14, 31:22-25 & Ex. 6 Dep. of Raymond Dallas 26:17 & Ex. 7 Dep. of Eddie White 10:5-15 [Doc. 15].

ladders with missing feet.  He also noted that JJFS longshoremen rarely use portable ladders, and that JJFS does not consistently provide its longshoremen with ladders.[19]

Even though it is the normal practice of JJFS to use its own ladders during discharge operations, JJFS employees, on the other hand, testified that they have in the past used ladders that did not belong to the stevedoring company.  Mr. Guion and Mr. Doucet testified to actively seeking out and using vessel-owned ladders, although they described the practice as uncommon.[20]  Mr. Chretien, Mr. Dallas, and Mr. White similarly noted that it is rare for longshoremen to use a vessel's portable ladders.[21]  Mr. White further testified that he had no knowledge of whether these leftover-ladders belonged to the vessels, whether the ladders belonged to the stevedores who originally loaded the cargo onto the ship, or whether the ladders belonged to stevedores that had discharged cargo at an earlier port.[22]  Mr. Chretein also explained that no vessel would leave one of its ladders at the bottom of a ship's cargo hold, since "if it's in the bottom, it will be crushed from the cargo."[23]

In addition, the deponents testified that JJFS requires its longshoremen to inspect ladders before using them.  If a ladder is unfit for safe use, JJFS longshoremen should place the ladder in

---

[19] Def.'s Mem. in Supp. of Summ. J., Ex. 6 Dep. of John H. Guion 14:4-11, 19:1-2 & Ex. 9 Dep. of Danny Doucet 10:11-13 [Doc. 15].

[20] *See* Def.'s Mem. in Supp. of Summ. J., Ex. 8 Dep. of Danny Doucet 13:7-14 & Dep. of John H. Guion 19:1-2 [Doc. 15].

[21] Def.'s Mem. in Supp. of Summ. J., Ex. 4 Dep. of Hollin Chretien 20:9 & Ex. 6 Dep. of Raymond Dallas 22:2-4, 26:8-9  & Ex. 7 Dep. of Eddie White 22:3-4 [Doc. 15].

[22] Def.'s Mem. in Supp. of Summ. J., Ex. 7 Dep. of Eddie White 14:8-10 [Doc. 15].

[23] Def.'s Mem. in Supp. of Summ. J., Ex. 4 Dep. of Hollin Chretien 31:17-18 [Doc. 15].

a location where it will not be used.[24]  Mr. Guion further testified that longshoremen at times will find and use the vessel's portable ladders, despite any obvious defects.[25]  Regardless, both the plaintiff and Gearbulk agree that it is standard practice to check ladders for any defects prior to use.[26]  If a ladder is defective and it results in a work stoppage, the longshoremen are still paid for any resulting downtime.[27]

Likewise, if a defective ladder is found, it is JJFS practice for Mr. Kingston to dispose of the ladder.  When asked whether he could remember throwing away the broken ladder after the alleged accident, Mr. Kingston could not remember whether he had or had not.  JJFS, moreover, has no record of the ladder because they keep no record of broken ladders.[28]

In addition, there is little evidence from the vessel that it owns portable ladders or had any record of a defective portable ladder in May 2008.  There is similarly no testimony whether vessel owners have a duty to regularly inspect the portable ladders on their vessels.[29]  Neither deposition testimony nor documentary evidence indicates that vessel owners regularly inspect the ladders on their vessels or engage in maintenance programs.[30]  There is testimony, however, that Gearbulk owns ladders and stores them in Warehouse 15, which is located on Lake Charles'

---

[24] See, e.g., Def.'s Mem. in Supp. of Summ. J., Ex. 6 Dep. of Raymond Dallas 23:15-18 [Doc. 15].  Indeed, the "standard practice is to check a ladder for safety prior to use."  Pl.'s Statement of Uncontested Material Facts ¶ 15 [Doc. 29-1].

[25] Def.'s Mem. in Supp. of Summ. J., Ex. 6 Dep. of John H. Guion 14:4-11 [Doc. 15].

[26] Pl.'s Statement of Uncontested Material Facts ¶ 14 [Doc. 29-1].

[27] See Def.'s Mem. in Supp. of Summ. J., Ex. 4 Dep. of Hollin Chretien 18-19, 27:15-16 [Doc. 15].

[28] Def.'s Mem. in Supp. of Summ. J., Ex. 6 Dep. of Jeff Kingston 23-24 [Doc. 15].

[29] For purposes of this Memorandum Ruling, the terms "Gearbulk," "vessel," "vessel owner," and "shipowner" are used synonymously to refer to both the N/V Dunlin Arrow and Gearbulk.

[30] Def.'s Mem. in Supp. of Summ. J., Ex. 6 Dep. of Jeff Kingston 22:22-25 [Doc. 15].

port.[31]  But, Richard Betancourt, who was Gearbulk's cargo superintendent at the time of the accident, provided an affidavit attesting that JJFS "provided the portable ladders used by its longshoremen to perform the cargo discharge operations in the Dunlin Arrow's holds in May 2008."[32]  Thus, none of the ladders employed in JJFS' discharge operations came from Gearbulk's warehouse.

## SUMMARY JUDGMENT STANDARD

A court should grant a motion for summary judgment when the pleadings, including the opposing party's affidavits, "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  The party moving for summary judgment is initially responsible for demonstrating the reasons justifying the motion for summary judgment by identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact for trial. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995).  The movant must "'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex*, 477 U.S. at 323).  "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Id.*

If the movant satisfies this burden, however, then the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Tubacex*, 45 F.3d at 954; *see also Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 311 (5th Cir. 1995) ("[That] evidence must be such that if introduced at trial it would suffice to prevent a directed verdict against the

---

[31] Def.'s Mem. in Supp. of Summ. J., Ex. 6 Dep. of Danny Doucet 18:18-21 [Doc. 15].

[32] Def.'s Mem. in Supp. of Summ. J., Aff. of Richard Betancourt ¶ 9 [Doc. 15].

nonmovant"). In evaluating motions for summary judgment, the court must consider all of the evidence in the record and view all facts in the light most favorable to the nonmoving party. *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). While the court must refrain from weighing the evidence, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'" *Delta & Pine Land Co.*, 530 F.3d at 399 (quoting *Liquid Air Corp.*, 37 F.3d at 1075). Ultimately, Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. In other words, summary judgment is warranted when the record as a whole "could not lead a rational finder of fact to find for the non-moving party." *Id.*

## ANALYSIS

Section 905(b) of the LHWCA expressly recognizes the right of a covered employee to sue a vessel for injuries sustained as a result of the vessel's negligence.[33] Although the LHWCA provides neither the elements of the cause of action nor the scope of liability, vessel liability may only arise in three instances:

> (1) if the vessel owner fails to warn on turning over the ship of hidden defects of which he should have known, [the "Turnover Duty"];
> (2) for injury caused by hazards under the control of the ship, [the "Active Control Duty"]; or
> (3) if the vessel owner fails to intervene in the stevedore's operations when he has actual knowledge both of the hazard and that the stevedore, in the exercise of 'obvious improvident' judgment, means to work on in the face of it and therefore cannot be relied on to remedy it, [which is described as the "Duty to Intervene"].

---

[33] It is undisputed that the plaintiff is a covered employee and Gearbulk is a vessel for purposes of § 905(b).

9

*Greenwood v. Societe Farncaise De*, 111 F.3d 1239, 1245 (5th Cir. 1997).

Although § 905(b) requires a vessel owner to exercise "reasonable care under the circumstances," vessel liability is intentionally narrow, as discussed by the Supreme Court in *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156 (1981). *Scindia* relieves a vessel owner of the automatic duty to inspect or supervise stevedoring operations, and places the primary responsibility for the longshoreman's safety on the stevedore and not the vessel owner. *Id.*

### (1) The "Turnover Duty"

"[T]he principle duty implicated in this case" is the turnover duty.[34]  The turnover duty requires the vessel to have the ship and its equipment in such condition that an "expert and experienced" stevedore, in the exercise of reasonable care, will reasonably be able to safely fulfill its cargo operations. *Scindia*, 451 U.S. at 166-67.  In turning over the ship, the vessel must warn the stevedore of latent or hidden dangers that are known or should have been known to the vessel in the exercise of due care.  *Id.*  Yet, the vessel's responsibility to warn of latent defects is narrow.[35]  As a result, the duty is generally limited by what is known or apparent to both the vessel and the stevedore. *Howlett v Birkdale Shipping Co.*, 512 U.S. 92 (1994).

In *Howlett v. Birkdale Shipping Co.*, for instance, the Supreme Court defined the contours of the duty to warn of latent defects.  *Id.* at 98.  It explained, "[t]he turnover duty encompasses only those hazards that 'are known to the vessel or should be known to it in the

---

[34] Pl.'s Opp'n 6 [Doc. 29].

[35] This rule is subject to one exception, as discussed *infra*: the vessel is still liable if the longshoreman's "only alternatives when facing an open and obvious hazard are unduly impracticable or time-consuming." *Greenwood*, 111 F.3d at 1246 (quoting *Hernandez v. M/V Rajaan*, 841 F.2d 582, 586 (5th Cir. 1988).

exercise of reasonable care.'" *Id.* at 99-100. And, it extends only to hazards "that are not known to the stevedore and that would be neither obvious to nor anticipated by a competent stevedore in the ordinary course of cargo operations." *Id.* at 99. The Supreme Court rejected a broader reading of the rule: one that sought to impose a duty on the vessel to make reasonable inspections after the completion of stevedoring operations to discover hazards in the ship's stow. *Id.* at 100. It reasoned that such a broad reading was unnecessary since "[a]ny hazards uncovered by a shipowner . . . would, as a matter of course, be discovered in a subsequent port by a stevedore 'reasonably competent in the performance of his work.'" *Id.* at 104.

Because the vessel's exercise of operational control and access over specific portions of the ship will vary, the Court further held that a vessel's responsibilities to inspect particular areas of the ship is commensurate with its access to and control of that area. *Id.* at 104-105. Specifically, the Court noted that a vessel's duty to discover defects in its stow is narrow because the vessel has restricted access and limited operational control over this area. *Id.* at 105. Accordingly, "[a]bsent actual knowledge of a hazard, the duty to warn may attach only if the exercise of reasonable care would place upon the shipowner an obligation to inspect for, or discover, the hazard's existence," and liability will only extend for injuries that could not be anticipated and prevented by a competent stevedore. *Id.*

Moreover, because the turnover duty requires the plaintiff to prove that the vessel had actual knowledge of the defect or had a duty to discover the defect, a vessel is not liable when there is no evidence that (1) the vessel had actual knowledge of the defect or (2) due care should have led the vessel to discover the defect. *See Moore v. M/V* ANGELA, 353 F.3d 376 (5th Cir. 2003); *Morris v. Campagnie Maritime Des Chargeurs Reunis, S.A.*, 832 F.2d 67 (5th Cir. 1987). In *Morris v. Campagnie Maritime Des Chargeurs Reunis, S.A.*, for example, the Fifth Circuit

reversed the district court's ruling that the shipowner breached its turnover duty. 832 F.2d at 69-70. In that case, the plaintiff-longshoreman was injured when he fell from a vessel's portable ladder while discharging cargo from the ship. *Id.* at 68. The ladder slipped because it "either had no rubber feet or the rubber feet were worn slick on the bottom." *Id.* The district court charged the shipowner with actual knowledge of the defective ladder because (1) the defect was obvious or, alternatively, (2) the vessel failed to use due care to discover the latent defect. *Id.* at 69. First, in rejecting the district court's decision, the Fifth Circuit held that absent contrary evidence of what practices constituted ordinary care, ordinary care did not include inspecting the vessel's ladders to ensure that they were fit for a longshoreman's use. *Id.* Second, the Fifth Circuit implicitly endorsed the district court's finding that the defect was obvious and held that the defect should have been as apparent to the stevedore as to the shipowner. *Id.* The court reasoned, "[i]t is contradictory to suggest that a careful shipowner should discover an apparent defect but that a careful stevedore may miss it with impunity." *Id.* at 69-70; *see Howlett*, 512 U.S. at 104. Thus, it reversed the district court's ruling, finding insufficient evidence to impose liability on the vessel for a breach of *Scindia's* turnover duty.

Likewise, if a defect is obvious to fellow longshoremen, even when it is not obvious to the injured longshoreman, it is apparent to a reasonably competent stevedore. *Greenwood*, 111 F.3d at 1249. However, if the longshoreman's "only alternatives when facing an open and obvious hazard are unduly impracticable or time-consuming," the vessel is still liable for the longshoreman's injury. *See Moore*, 353 F.3d at 379. For instance, in *Greenwood v. Societe Francaise De*, the Fifth Circuit reversed the judgment for the plaintiff, the injured longshoreman, and rendered judgment for the defendant-vessel, finding, in part, insufficient evidence to support the vessel's liability under *Scindia's* turnover duty. 111 F.3d at 1246-49. In that case, the

12

plaintiff was injured while assisting with the discharge of cargo in the defendant's vessel after the slewing brake on the vessel's crane malfunctioned, causing a cargo hook to strike the plaintiff in the face. *Id.* at 1242. The crane's operator, however, testified that he noticed the defect in the slewing brake as soon as he began operating that day, and a fellow longshoreman testified that he could visually observe the crane malfunction. *Id.* at 1246. Thus, the Fifth Circuit held that the vessel could not be liable for the plaintiff's injuries. *Id.* at 1248. It reasoned that the defect was open and obvious to a reasonably competent stevedore when the longshoremen first operated the crane, despite the plaintiff's apparent lack of knowledge of the defect. *Id.* at 1246-47. Accordingly, the court found that the vessel could rely on the expertise of the stevedore and presume that the stevedore considered the equipment's "condition, though dangerous, [was] safe enough." *Id.* at 1248.

The plaintiff, nevertheless, asserted the exception to the so-called "obviousness" defense: that the crane operator had no alternative but to continue to use the defective crane. *Id.* Specifically, he explained that longshoremen generally operate defective machinery "to avoid facing trouble for delaying the work." *Id.* The court rejected this argument, finding that "[t]his observation concerning cargo operations in general cannot substitute for evidence that such was the case in this particular instance." *Id.* The court further explained that even if the repairs would delay the work, the longshoremen would be paid for the down time. *Id.* (citing *Teply v. Mobil Oil Corp.*, 859 F.2d 375, 378 (5th Cir. 1988) ("Ship owners are not liable for obvious dangers that injure contractors aboard their vessels unless the contractors, in order to avoid the danger, would be forced either to leave the job or to face penalties for causing delay")). Therefore, the court held that there was insufficient evidence to find that the vessel breached its turnover duty,

and the plaintiff "failed to submit sufficient evidence to fit within the scope of [the] exception." *Id.*

In dispute here is whether there is sufficient evidence for a reasonable jury to find that the N/V Dunlin Arrow owned the defective ladder used by the plaintiff. And, alternatively, whether there is sufficient evidence to find that Gearbulk is liable to the plaintiff under the turnover duty. Gearbulk identifies portions of discovery showing the lack of a genuine issue of material fact for trial. It does so "by pointing out 'the absence of evidence supporting [the plaintiff's] case." *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312 (5th Cir. 1995); *see also Chiari v. City of League City,* 920 F.2d 311, 314-15 (5th Cir. 1991) ("The test is identical to that used for a directed verdict: 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law'").

The plaintiff, however, argues that since the ladder was in the vessel's hold, it is reasonable to infer that the ladder belongs to the ship when considering additional circumstantial evidence. According to the plaintiff, there is a triable issue over ownership and liability because (1) JJFS has no record of the ladder, (2) there is no direct evidence of any longshoremen bringing the ladder onto the vessel, and (3) there is no evidence of any longshoremen having extracted dunnage before the accident that would require a ladder to be placed in Hold 2.[36]

In sum, he argues that the lack of direct evidence is not dispositive. Indeed, although this in-and-of-itself is not fatal to the plaintiff's case, the lack of direct evidence indicates that a jury's decision will rest on circumstantial evidence. The plaintiff contends that the circumstantial evidence is sufficient to raise a genuine issue of material fact for trial. While this

---

[36] Pl.'s Opp'n 6-8 [Doc. 29]. The plaintiff also contends that these facts also demonstrate that the defect existed "from the outset" and that the ladder was not an open and obvious defect. But, as discussed *infra*, neither argument provides any basis for imposing liability on the vessel or Gearbulk.

14

Court must give the benefit of every legitimate inference to the plaintiff, evidence based on speculation and conjecture is insufficient to withstand summary judgment. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000); *Anthony v. Chevron USA, Inc.*, 284 F.3d 578 (5th Cir. 2002); *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379 (5th Cir. 1996) (finding inference of causation based on chronology of events is unreasonable); *Jacobs v. Tapscott*, 516 F. Supp. 2d 639, 649 (N.D. Tex. 2007) ("Because of the requirement that the verdict must be supported by *substantial* evidence, a verdict may not rest on speculation and conjecture. Similarly, the jury's freedom to draw inferences from the evidence does not extend so far as to allow a wholly unreasonable inference or one which amounts to mere speculation or conjecture.") (quoting *Nichols Constr. Corp. v. Cessna Aircraft Co.*, 808 F.2d 340, 346-47 (5th Cir. 1985)). Ultimately, however, the plaintiff's evidence is insufficient to support his cause of action. Specifically, "the record taken as a whole could not lead a rational trier of fact to find for [the plaintiff]" for three principles reasons: (1) insufficient evidence that the vessel owned the ladder, (2) insufficient evidence of the vessel's actual knowledge of the defective ladder, and (3) the defect was obvious to a reasonable competent stevedore. *See Matsushita*, 475 U.S. at 587.

First, there is insufficient evidence for a reasonable jury to infer that Gearbulk owned the defective ladder. On May 14, Gearbulk turned over the N/V Dunlin Arrow to JJFS to perform discharge operations, granting JJFS longshoremen exclusive access to the ship's holds. No evidence further indicates that the N/V Dunlin Arrow even owned portable ladders at the time of the accident. In addition, according to the affidavit of Mr. Betancourt, "[JJFS] provided the portable ladders used by its longshoremen to perform the cargo discharge operations in the Dunlin Arrow's holds in May 2008."[37] This is consistent with federal regulation, which requires

---

[37] Def.'s Mem. in Supp. of Summ. J., Ex. 1 Aff. of Richard Betancourt ¶ 9 [Doc. 15].

stevedores to provide ladders to its longshoremen. *See* 29 C.F.R. § 1918.24 (Safety and Health Regulations for Longshoring). In addition, no deponent ever testified to discovering a Gearbulk or vessel ladder on the floor of the ship's hold. In fact, the only evidence indicating that the vessel owned the ladder is based on (1) the plaintiff's unsubstantiated and speculative personal belief and (2) uncommon circumstances "concerning cargo operations in general"; evidence the Fifth Circuit rejected in *Greenwood*. 111 F.3d at 1248.

The plaintiff's additional arguments – those based on (1) record keeping, (2) no pre-accident dunnage extraction, and (3) Gearbulk's lack of evidence that JJFS owned the defective ladder – are insufficient to imply that Gearbulk owned the defective ladder. The record keeping evidence is insufficient because JJFS does not record what ladders are used at specific job sites. While it is the practice of Mr. Kingston to discard broken ladders, he does not keep a record of which ladders he destroys. When asked whether he could recall destroying the allegedly defective ladder, he could not recall whether he had or had not.[38] Viewing this evidence in a light most favorable to the plaintiff, it provides no inference that the ladder belonged to the vessel.

In addition, the plaintiff's argument concerning dunnage extraction before the accident is irrelevant. Just because no JJFS longshoreman extracted dunnage from Hold 2 does not imply that no JJFS longshoremen entered Hold 2 with a portable ladder before the accident. Even if the plaintiff's contention were reasonable, the affidavits and deposition testimony provide the opposite conclusion. JJFS longshoremen were in Hold 2 unloading cargo the day before the accident and just before the plaintiff entered that hold to extract dunnage. Although a district court must construe all reasonable inferences in a light most favorable to the plaintiff, it may not

---

[38] Def.'s Mem. in Supp. of Summ. J., Ex. 3 Deposition of Jeff Kingston 23-24 [Doc. 15].

16

ignore uncontroverted evidence. *See Greenwood*, 111 F.3d at 1249.  Contrary to the plaintiff's assertion, this demonstrates that longshoremen were in Hold 2 before the accident.  As a result, any inference drawn from the plaintiff's argument to indicate Gearbulk owned the ladder is based on speculation and conjecture.

Similarly, any argument based on Gearbulk's evidence of ownership is insufficient.  It incorrectly conflates the movant's summary judgment burden with the plaintiff's burden of proof at trial.  While Gearbulk's Summary Judgment burden is to designate specific facts showing the lack of a material issue for trial, *Tubacex*, 45 F.3d at 954, it is the plaintiff's burden at trial to prove that the ladder belonged to the vessel. *See* 33 U.S.C. § 905(b) (2006).  When Gearbulk demonstrates that the plaintiff has insufficient evidence to prove Gearbulk's ownership of the ladder, the burden of persuasion shifts to the plaintiff. *Tubacex*, 45 F.3d at 954.  The plaintiff must then designate specific facts showing a material dispute as to ownership. *See id.*  He has provided insufficient evidence here.  Consequently, he is unable to carry his burden of proof at trial.  As a result, summary judgment is appropriate.  The plaintiff has failed "to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial." *See Celotex*, 477 U.S. at 322.

Second, even assuming that those uncommon "observations concerning cargo operations in general" were sufficient to infer that Gearbulk owned the defective ladder, no evidence indicates that the vessel had actual knowledge of the defect.  Although a shipowner is charged with actual knowledge of a latent hazard if the condition exists from the outset, *Greenwood*, 111 F.3d at 1247, there is absolutely no evidence, circumstantial or otherwise, that the hazard existed upon discharge: longshoremen were actively discharging cargo from Hold 2 well before the plaintiff's injury.  The plaintiff has submitted no evidence from the vessel that would enable a

17

reasonable jury to infer that the M/V Dunlin Arrow owns portable ladders, much less that it owned a defective portable ladder upon turnover. In addition, there is no evidence implying that any longshoremen noticed a defective ladder in Hold 2 when they began discharge operations. *See, e.g., Greenwood*, 111 F.3d at 1246 (finding that shipowner could be charged with actual knowledge of the crane's defective slewing brake when the operating longshoremen testified that he noticed the defect immediately upon operation and the ship's log had previously listed the slewing brake as being in "slight doubt").

Furthermore, there is no evidence that the vessel had a duty to discover and warn of its defective portable ladder. Similar to the lack of evidence in *Morris*, there is no evidence here that the vessel knew that longshoremen use the vessel's ladders or that the vessel had a duty to inspect its ladders for potential defects. 832 F.2d at 69. While there is evidence that Gearbulk stores portable ladders in its warehouse, neither testimony nor documentary evidence demonstrates that vessel owners either maintain or inspect the vessel's portable ladders. *See id.* (finding that plaintiff failed to establish that shipowner had a duty to inspect its ladders, in part, due to a lack of documentary evidence indicating that shipowners actually inspect their ladders). As noted earlier, JJFS protocol and federal regulation mandates that JJFS provide its longshoremen with ladders to use during discharge operations. *See* 29 C.F.R. § 1918.24.

Likewise, there is no indication that the vessel has a duty to check its stow to ensure that defective ladders were not left by longshoremen at previous ports. As the Supreme Court reasoned in *Howlett*, a vessel's duty to discover defects in its stow is narrow since it has limited access and operational control over this area. 512 U.S. at 105. To hold otherwise would impose an overly broad duty on the shipowner, a duty the Court explicitly rejected in *Howlett*, since "[a]ny hazards uncovered by a shipowner . . . would, as a matter of course, be discovered in a

subsequent port by a stevedore 'reasonably competent in the performance of his work.'" *Id.* at 104. Thus, viewing the evidence in a light most favorable to the plaintiff, there is insufficient evidence to infer that the vessel had actual knowledge of the defect or a duty to discover it.

Finally, even if the N/V Dunlin Arrow owned the defective ladder and had actual knowledge of the defect, it would be obvious to or anticipated by a stevedore "reasonably competent in the performance of his work." *See Scindia*, 451 U.S. at 166-67. The evidence indicates that JJFS longshoremen were in Hold 2 discharging cargo from the N/V Dunlin Arrow before the plaintiff's accident. Based on the deposition testimony, portable ladders are used to travel tier-to-tier in the ship's hold to help unload cargo. Mr. Doucet further admitted that longshoremen will find and use vessel ladders to assist in discharge operations. Thus, on the one hand, a fellow JJFS longshoreman could have found, used, and placed the defective ladder on the floor of Hold 2.

In that case, as the Fifth Circuit implicitly endorsed in *Morris*, the absence of a footing on a ladder is at best an obvious defect to a reasonably competent stevedore. 832 F.2d 69-70; *see also Pluyer v. Mitsui O.S.K. Lines*, 664 F.2d 1243, 1247-48 (5th Cir. 1982) (finding that rubber feet missing on a vessel-provided ladder was an obvious defect to reasonably competent stevedore).[39] Even if no longshoremen discovered the defect, based on the testimony and the

---

[39] The plaintiff cites *Pluyer* for the proposition that a faulty ladder can constitute a defect or hazard to support liability under § 905(b). His citation to this case, however, is misplaced. In *Pluyer*, the court held the vessel liable for a longshoremen's injury under § 905(b) despite finding that "the danger of a metal ladder without non-skid devices slipping on a metal deck was an open and obvious defect." 664 F.2d at 1247-48. Use of the defective ladder was unavoidable, and asking another longshoreman to hold it would have been impractical under the circumstances. *Id.* at 1247. Liability extended to the vessel only because the longshoreman was required to face the danger notwithstanding knowledge. *Id.* Here, however, there is no evidence that the plaintiff had no alternatives but to use the ladder. In fact, the plaintiff was able to safely climb out of the hold after he fell. If use of the ladder was unavoidable, he would have been unable to climb out. And, as discussed *infra*, he would have been paid for any resulting downtime.

plaintiff's admission, the defect should have been anticipated by a reasonably competent stevedore in the performance of his work. *See Scindia,* 451 U.S. at 167; *Morris,* 832 F.2d at 69-70. For example, it is JJFS protocol for longshoremen and supervisory personnel to inspect ladders before use. Although Mr. Guion admitted that Longshoremen often use defective ladders, his testimony indicates that it is unreasonable not to check a ladder for defects or have other longshoremen hold the ladder prior to use.[40]  Indeed, the plaintiff admits that it is standard practice to check ladders for any defects prior to use. While the plaintiff may not have observed the defect, that condition is insufficient to impose liability on the vessel, as the court endorsed in *Greenwood.* 111 F.3d at 1246-47. Accordingly, when a defect is obvious to fellow longshoremen, the stevedore should have noticed or anticipated that defect in the exercise of due care. *See id.* When such an obvious or anticipated defect exists, a vessel may rely on the expertise of the stevedore and presume that the stevedore considers the equipment's "condition, though dangerous, [is] safe enough." *Id.*

Consequently, the plaintiff's case hinges on a vessel employee, rather than a fellow longshoreman, placing the ladder on the floor of Hold 2. Yet, there is no evidence that the vessel's crew was present on the M/V Dunlin Arrow during the cargo unloading operations. Thus, if the vessel's crew left a ladder on the floor of Hold 2, it would have been placed there before the M/V Dunlin Arrow arrived in Lake Charles.

The evidence, however, indicates that such a situation is impossible. When the M/V Dunlin Arrow arrived at port, the vessel's crew turned the ship over to JJFS, who was responsible for unloading the cargo. The cargo covered the floor of Hold 2; it was stacked

---

[40] Def.'s Mem. in Supp. of Summ. J., Ex. 8, Deposition of John H. Guion 13:11-16 (Describing the practice of using a ladder without someone there to help support the ladder as "foolish") [Doc. 15].

vertically, two-tiers high.  The longshoremen, employed by the stevedoring company, discharged the cargo by working their way from the top of the ship's hold down to the bottom of the ship's hold.  Thus, if the vessel's crew were to leave a ladder on the floor of the ship's hold, it would have been crushed when the cargo was loaded.  Otherwise, any leftover ladder would be on top of the cargo, as the material stabilizing the cargo would obstruct access to the floor of the hold. This inference is consistent with the deposition testimony of Mr. Chretien, who admitted that he observed Gearbulk ladders on top of cargo in Gearbulk ships.[41]  Accordingly, a fellow JJFS longshoreman, one assisting with the unloading operations on either May 14 or May 15, would have had to place the ladder on the floor of Hold 2.  In that case, any defect in the ladder would be obvious to a reasonably competent stevedore. *See Morris*, 832 F.2d at 69-70.

   While the plaintiff implicitly argues that it was not feasible for him to check the ladder before use, there is no evidence to indicate that ensuring his own safety was impracticable or time-consuming.[42]  Furthermore, this feasibility argument is counter-intuitive.  He claims that it was infeasible to check the ladder before he descended.  But, he fell while climbing the ladder. Since it is standard practice to inspect a ladder prior to use, the plaintiff should have checked the ladder before he tried to climb out of the ship's hold.  While the plaintiff may have assumed the ladder was fit for use because he was able to safely descend, he nevertheless failed to follow protocol and check the ladder before he used it.  Regardless, no evidence indicates that he would face trouble for any delayed work had he checked it.  In fact, like the plaintiff in *Greenwood,* he would be paid for any resulting downtime.  111 F.3d at 1248.  Thus, plaintiff has failed to

---

[41] Def.'s Mem. in Supp. of Summ. J., Ex. 4 Dep. of Hollin Chretien 30:14-25 [Doc. 15].

[42] Pl.'s Statement of Uncontested Material Facts ¶ 14 [Doc. 29-1].

21

provide sufficient evidence that the only alternatives to the obvious hazard were unduly impracticable or time-consuming. *See id.*

Viewing the facts in a light most favorable to the plaintiff, there is no genuine issue of material fact for trial. A contrary result would displace the purpose of the LHWCA by placing the accident-avoidance costs on the party who is least able to avoid the accident: the vessel. And it would lessen the stevedore's incentive to act with caution to avoid similar accidents. Therefore, the defendant is entitled to summary judgment.

### (2) The "Active Control Duty" and "Duty to Intervene"

The two remaining *Scindia* duties are the "Active Control Duty" and the "Duty to Intervene." Based on the evidence, summary judgment is appropriate. Under the Active Control Duty, "a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the 'active control of the vessel.'" *Howlet*, 512 U.S. at 98.

Here, the evidence is uncontroverted. Gearbulk did not exercise active control of Hold 2. JJFS employees solely performed cargo unloading operations, and JJFS actively controlled the cargo operations aboard the M/V Dunlin Arrow. In fact, there is no evidence that the vessel actively involved itself in the cargo operations or actively controlled any equipment during the stevedoring operation. Accordingly, the *Scindia* active control duty is inapplicable to this case.

Under the Duty to Intervene, a shipowner may be liable for its failure to intervene when it has actual knowledge of a defect in the vessel's equipment and of the stevedore's continuing use of the defective item. *Greenwood*, 111 F.3d at 1239. This duty, moreover, is applicable in only limited circumstances. "[A]bsent a contract provision, positive law, or custom to the contrary, the shipowner has no general duty by way of supervision or inspection." *Scindia*, 451 U.S. at 172. Here, there is no evidence that the vessel or its crew had actual knowledge of the defective

22

ladder or the stevedore's continuing use of the ladder.  In addition, there is no evidence to impose a duty on Gearbulk to supervise or inspect the cargo unloading operations.  Therefore, the *Scindia* duty to intervene is inapplicable in this case.

## CONCLUSION

Because there is no genuine issue of material fact for trial,

IT IS ORDERED that Gearbulk's Motion for Summary Judgment is hereby GRANTED.

IT IS FURTHER ORDERED that the plaintiff's claims against the defendants are hereby DISMISSED with prejudice at the plaintiff's cost.

Lake Charles, Louisiana, this ⟨handwritten: 5⟩ day of ⟨handwritten: Jan⟩ 2011.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE